IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bowfin KeyCon Holdings, LLC; : 
Chief Power Finance II, LLC; : 
Chief Power Transfer Parent, LLC; : 
KeyCon Power Holdings, LLC; : 
GenOn Holdings, Inc.; Pennsylvania : 
Coal Alliance; United Mine Workers : 
of America; International Brotherhood : 
of Electrical Workers; and International : 
Brotherhood of Boilermakers, Iron Ship : 
Builders, Blacksmiths, Forgers and : 
Helpers, : 
            : 
                 Petitioners : 
            : 
              v. : No. 247 M.D. 2022
            : Argued: November 16, 2022
Pennsylvania Department of : 
Environmental Protection : 
and Pennsylvania Environmental : 
Quality Board, : 
            : 
                 Respondents : 

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                   HONORABLE PATRICIA A. McCULLOUGH, Judge
                   HONORABLE MICHAEL H. WOJCIK, Judge
                   HONORABLE ELLEN CEISLER, Judge
                   HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                          FILED: November 1, 2023

        Before the Court are the cross-applications for summary relief (cross-ASRs) filed on behalf of Bowfin KeyCon Holdings, LLC, Chief Power Finance II,

LLC, Chief Power Transfer Parent, LLC, KeyCon Power Holdings, LLC, GenOn Holdings, Inc., Pennsylvania Coal Alliance, United Mine Workers of America, International Brotherhood of Electrical Workers, and International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (collectively, Petitioners), and the Pennsylvania Department of Environmental Protection (DEP) and the Pennsylvania Environmental Quality Board (EQB), regarding the April 25, 2022 Petition for Review (PFR) filed in our original jurisdiction by Petitioners seeking declaratory and injunctive relief. The PFR relates to Pennsylvania's participation in the Regional Greenhouse Gas Initiative (RGGI) based on regulations promulgated by DEP and EQB, referred to as the "Trading Program Regulation" (Rulemaking). Following careful review, we grant in part, and dismiss in part, the cross-ASRs,[1] and grant the requested declaratory and injunctive relief in part.

---

[1] In considering the cross-ASRs, it is appropriate for this Court to take judicial notice of our prior memorandum opinions and orders in this matter in *Bowfin KeyCon Holdings, LLC v. Pennsylvania Department of Environmental Protection* (Pa. Cmwlth., No. 247 M.D. 2022, filed July 8, 2022) (*Bowfin*), and in the related matter in *Ziadeh v. Pennsylvania Legislative Reference Bureau* (Pa. Cmwlth., No. 41 M.D. 2022, filed January 19, 2023) (*Ziadeh*), and the various filings on the dockets of these cases. *See, e.g.*, Pa.R.E. 201(b)(2) (permitting courts to take judicial notice of facts that may be "determined from sources whose accuracy cannot reasonably be questioned"); *Moss v. Pennsylvania Board of Probation and Parole*, 194 A.3d 1130, 1137 n.11 (Pa. Cmwlth. 2018) ("[T]his Court may take judicial notice of information contained in the publicly[ ]available docket of [the underlying proceedings]," and "'[i]t is well settled that this Court may take judicial notice of pleadings and judgments in other proceedings . . . where, as here, the other proceedings involve the same parties.'") (citations omitted); *Elkington v. Department of Corrections* (Pa. Cmwlth., No. 478 M.D. 2018, filed May 27, 2021), slip op. at 9 n.4 ("Although not introduced by the parties, the underlying criminal proceedings are directly related to the claims made here and are referenced throughout the pleadings, and this Court may take judicial notice of the dockets of other courts of the Commonwealth.") (citations omitted); *see also* Pa.R.A.P. 126(b)(1)-(2) ("As used in this rule, 'non-precedential decision' refers to . . . an unreported memorandum opinion of the Commonwealth Court filed after January 15, 2008. . . . Non-precedential decisions . . . may be cited for their persuasive value.").

This Court has previously summarized the stipulated facts in this matter as follows:

The Rulemaking establishes a program to limit the emission of [carbon dioxide ($CO_2$)] from fossil fuel-fired electric generating units (EGUs) located in the Commonwealth with a nameplate capacity equal to or greater than 25 [megawatts]. The Rulemaking requires the EGUs to obtain allowances for each ton of $CO_2$ emitted and imposes permitting, monitoring, reporting, and record-keeping requirements on them. It is the position of [the] DEP Secretary[], DEP, EQB, [and proposed intervenors] "that $CO_2$ is a 'pollutant' that can be regulated under Pennsylvania's [Air Pollution Control Act (APCA).[2]]

Under the Rulemaking, Pennsylvania will distribute $CO_2$ allowances available to each EGU through quarterly regional allowance auctions. The Rulemaking contains a declining $CO_2$ allowance trading budget that would incrementally reduce the number of $CO_2$ allowances allocated by DEP to the air pollution reduction account for sale via an allowance auction. The Rulemaking would enable DEP to participate in a multistate $CO_2$ allowance auction, such as [RGGI], provided that participation could provide benefits to the Commonwealth that meet or exceed the benefits conferred on Pennsylvania through its own Pennsylvania-run auction process. Eleven other states currently participate in RGGI, namely Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, Vermont, and Virginia.

To become a "Participating State" in RGGI, a state is required to (1) develop a regulation sufficiently consistent with the RGGI Model Rule and (2) sign a contract between the state agency and RGGI, Inc., to engage RGGI, Inc.'s services. RGGI, Inc., is a [Section] 501(c)(3) non-profit corporation created to facilitate

---

[2] Act of January 8, 1960, P.L. (1959) 2119, *as amended*, 35 P.S. §§4001-4015.

3

administrative and technical support services to Participating States in RGGI. . . . In developing the Rulemaking, DEP performed certain modeling that was designed to forecast, among other things, the economic and environmental impacts that would result from the Rulemaking. . . . Any proceeds received by DEP from RGGI auctions and civil fines and penalties for excess emissions will be deposited into the Clean Air Fund.

\* \* \*

On April 18, 2022, the Legislative Reference Bureau submitted the Rulemaking to its contractor for publication in the April 23, 2022 issue of the Pennsylvania Bulletin. On April 23, 2022, the Rulemaking was published in the Pennsylvania Bulletin. The Rulemaking will be codified in the Pennsylvania Code at Title 25, Chapter 145, Subchapter E, which will be entitled "$CO_2$ Budget Trading Program." Codification of the Rulemaking is anticipated in the July 2022 supplement to the Pennsylvania Code.

*Bowfin*, slip op. at 4-6, 8. The Rulemaking is codified at Sections 145.301 through 145.409 of DEP's regulations, 25 Pa. Code §§145.301-145.409.

In considering the instant cross-ASRs[3] with respect to the merits of the first claim in the PFR, in granting a preliminary injunction, we previously observed:

Petitioners assert that the Rulemaking is unconstitutional because it usurps the authority of the General Assembly to levy taxes under the Pennsylvania Constitution and is not otherwise statutorily authorized.

---

[3] Pa.R.A.P. 1532(b) states, in relevant part: "At any time after the filing of a petition for review in an . . . original jurisdiction matter, the court may on application enter judgment if the right of the applicant thereto is clear." Judgment may be entered "'if a party's right to judgment is clear and no material issues of fact are in dispute.' 'In ruling on [ASRs], we must view the evidence of record in the light most favorable to the non-moving party and enter judgment only if there is no genuine issue as to any material facts and the right to judgment is clear as a matter of law.'" *Eleven Eleven Pennsylvania, LLC v. State Board of Cosmetology*, 169 A.3d 141, 145 (Pa. Cmwlth. 2017) (citations omitted).

4

The power to levy taxes is specifically reserved to the General Assembly. P[a]. C[onst]. art. II, §1;[4] *Thompson v. City of Altoona Code Appeals Board*, 934 A.2d 130, 133 (Pa. Cmwlth. 2007) ("It is well[ ]settled that '[t]he power of taxation . . . lies solely in the General Assembly of the Commonwealth acting under the aegis of the Constitution.'") (quoting *Mastrangelo v. Buckley*, 250 A.2d 447, 452-53 (Pa. 1969)). While the General Assembly may delegate the power to tax, such as to a municipality or political subdivision, any such delegation must be "plainly and unmistakably conferred . . . and the grant of such right must be strictly construed and not extended by implication." *Mastrangelo*, 250 A.2d at 453 (emphasis in original); *see also* P[a]. C[onst]. art. III, §31 (placing restrictions on General Assembly's right to delegate its taxing authority). The Senate states that there has been no such delegation here under the APCA, the statutory authority relied upon by [] DEP in enacting the current Rulemaking.

The APCA specifically permits the imposition of fees to cover the costs of administering any air pollution control program authorized by the statute. Specifically, Section 6.3(a) of the APCA "authorizes the establishment of fees sufficient to cover the indirect and direct costs of administering the air pollution control plan approval process, operating permit program required by Title V of the [federal] Clean Air Act,[5] other requirements of the Clean Air Act and . . . to support the air pollution control program authorized by this act and not covered by fees required by [S]ection 502(b) of the Clean Air Act.[6]" 35

---

[4] Article II, section 1 of the Pennsylvania Constitution, Pa. Const. art. II, §1, states: "The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." *See also* article III, section 10, Pa. Const. art. III, §10, which states: "All bills for raising revenue shall originate in the House of Representatives, but the Senate may propose amendments as in other bills."

[5] 42 U.S.C. §§7661-7661f.

[6] 42 U.S.C. §7661a(b).

5

P.S. §4006.3(a).[7]   Additionally, Section 9.2(a) of the APCA allows for the collection and deposit of "fines, civil penalties and fees into . . . the Clean Air Fund." 35 P.S. §4009.2(a).[8]

This Court has previously considered the question of what constitutes a proper regulatory fee as opposed to a tax.  We have stated:

> A licensing fee, of course, is a charge which is imposed pursuant to a sovereign's police power for the privilege of performing certain acts, and which is intended to defray the expense of regulation.   It is to be distinguished from a tax, or revenue producing measure, which is characterized by the production of large income and a high proportion of income relative to the costs of collection and supervision.

*Simpson v. City of New Castle*, 740 A.2d 287, 292 (Pa. Cmwlth. 1999) (emphasis added) (quoting *Greenacres Apartments, Inc. v. Bristol Township*, 482 A.2d 1356, 1359 (Pa. Cmwlth. 1984)).

We cannot . . . agree with [DEP] Secretary McDonnell's argument that the allowance auction proceeds do not constitute a tax.  First, it is undisputed that the auction proceeds are remitted to the [P]articipating [S]tates.  Senate Ex[hibit] 22 (52 Pa.B. at 2482 ("The $CO_2$ allowances purchased in the multistate auctions generate proceeds that are provided back to the [P]articipating [S]tates, including the Commonwealth, for investment in initiatives that will further reduce $CO_2$ emissions.")).  Secretary McDonnell's position is unpersuasive where it is undisputed that the auction proceeds are to be deposited into the Clean Air Fund, are generated as a direct result of the Rulemaking, and [] DEP anticipates significant monetary benefits from participating in the auctions.  In

---

[7] Added by the Act of July 9, 1992, P.L. 460.

[8] Added by the Act of October 26, 1972, P.L. 989.

6

addition, and importantly, it is unclear under what authority [] DEP may obtain the auction proceeds for Pennsylvania allowances purchased by non-Pennsylvania covered sources not subject to [] DEP's regulatory authority and which are not tethered to $CO_2$ emissions in Pennsylvania.

Second, the Rulemaking record, namely [] DEP's 2020 modeling, estimated that only 6% of the proceeds from the $CO_2$ allowances auctions would be for "programmatic costs related to administration and oversight of the $CO_2$ Budget Trading Program (5% for [DEP] and 1% for RGGI, Inc.)." 52 Pa.B. at 2508. The remaining proceeds from the $CO_2$ allowance[s] auctions will be deposited into an air pollution reduction account within the Clean Air Fund maintained by [] DEP, with the use of such proceeds exclusively limited to the elimination of air pollution. *See* 52 Pa.B. at 25[2]5, 2545 (Rulemaking §§145.343 and 145.401).

Third, Secretary McDonnell acknowledged that from 2016 to 2021, the Clean Air Fund annually maintained between $20 million and $25 million in funds, the total expenditures exceeded the receipt of funds by $1 million for the years 2016 to 2020, but with the inclusion of anticipated $CO_2$ [allowance auction] proceeds, the estimated receipts for the 2022-23 budget year exceed $443 million. [Notes of Testimony] 5/10/2022, at 132-35. In fact, [] DEP's total budget for the 2021-22 fiscal year, *i.e.*, the total funds appropriated to [] DEP from the General Fund, was slightly in excess of $169 million. *See Pennsylvania Treasury, General Fund Current Fiscal Year Enacted Budget: Appropriated Departments*, https://www.patreasury.gov/transparency/budget.php (last visited June 23, 2022).

*Bowfin*, slip op. at 25-28 (emphasis in original and footnotes omitted).

Upon further review and consideration, we reaffirm our determination in this regard, and now hold that the Rulemaking constitutes a tax that has been

imposed by DEP and EQB in violation of the Pennsylvania Constitution. Indeed, as the Pennsylvania Supreme Court explained long ago:

> No principle is more firmly established in the law of Pennsylvania than the principle that a revenue tax cannot be constitutionally imposed upon a business under the guise of a police regulation, and that if the amount of a "license fee" is grossly disproportionate to the sum required to pay the cost of the due regulation of the business the "license fee" act will be struck down. The courts interfere with the discretion of the legislature in such matters only "where the regulations adopted are arbitrary, oppressive, or unreasonable." The regulations in question when tested by this standard require judicial interference with the legislative act creating them.

*Flynn v. Horst*, 51 A.2d 54, 60 (Pa. 1947) (citation omitted).[9]

As outlined above, in this case, it is undisputed that: (1) DEP and EQB anticipate significant monetary benefits from participating in the auctions, the proceeds obtained thereby are to be deposited into the Clean Air Fund, and they are generated as a direct result of the Rulemaking; (2) there is no cited authority under which DEP and EQB may obtain or retain the auction proceeds for Pennsylvania allowances that are purchased by non-Pennsylvania covered sources, which are not subject to DEP's and EQB's regulatory authority, and which are not tethered to $CO_2$ emissions in Pennsylvania; (3) only 6% of the proceeds from the auctions would be attributable to "programmatic costs related to administration and oversight of" the program, with a mere 5% going to DEP and EQB; and (4) the estimated moneys

---

[9] *See also Sunrise Energy, LLC v. FirstEnergy Corp.*, 148 A.3d 894, 907 (Pa. Cmwlth. 2016), *appeal denied*, 169 A.3d 1025 (Pa. 2017) ("[A]n agency cannot confer authority upon itself by regulation. Any power exercised by an agency must be conferred by the legislature in express terms. *Aetna Casualty and Surety Company v.* [*Insurance Department*, 638 A.2d 194, 200 (Pa. 1994)] (stating that an agency can only exercise powers 'conferred upon it by the Legislature in clear and unmistakable language') (citation omitted).").

8

received by DEP and EQB from the auctions in a single budget year will exceed the total funds appropriated to DEP from the General Fund by nearly threefold. Where, as here, the moneys generated and received by the Commonwealth's participation in the auctions are "grossly disproportionate" to the costs of overseeing participation in the program or DEP's and EQB's annual regulatory needs, and relate to activities beyond their regulatory authority, the regulations authorizing Pennsylvania's participation in RGGI are invalid and unenforceable.

Stated simply, to pass constitutional muster, the Commonwealth's participation in RGGI may only be achieved through legislation duly enacted by the Pennsylvania General Assembly, and not merely through the Rulemaking promulgated by DEP and EQB. As a result, we will grant Petitioners' ASR in part.[10]

---

[10] Based on our disposition of the ASR on this PFR claim, all remaining ASRs and applications filed by the parties are dismissed as moot. Moreover, any claims raised by *amici* that are not raised by the parties will not be addressed by this Court in this matter. As the Pennsylvania Supreme Court has explained:

> [A]*micus* briefs cannot raise issues not set forth by the parties. *Hosp*[ital] *& Healthsystem Ass*[ociatio]*n of Pennsylvania v. Dep*[artmen]*t of Pub*[lic] *Welfare*, [888 A.2d 601, 606 n.10 (Pa. 2005)]; 4 Am.Jur.2d Amicus §7 (2005) ("[A]n *amicus* must accept the case before the court with the issues made by the parties. Accordingly, an *amicus curiae* ordinarily cannot inject new issues into a case which have not been presented by the parties.").

*Banfield v. Cortes*, 110 A.3d 155, 172 n.14 (Pa. 2015).

Accordingly, we grant Petitioners' ASR asserting that the Rulemaking is an invalid tax; we declare that the Rulemaking is void; and we enjoin DEP and EQB from enforcing its provisions.


_____
MICHAEL H. WOJCIK, Judge

Judge Covey did not participate in the decision of this case.
Judge Fizzano Cannon did not participate in the decision of this case.
Judge Wallace did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Bowfin KeyCon Holdings, LLC;<br>Chief Power Finance II, LLC;<br>Chief Power Transfer Parent, LLC;<br>KeyCon Power Holdings, LLC;<br>GenOn Holdings, Inc.; Pennsylvania<br>Coal Alliance; United Mine Workers<br>of America; International Brotherhood<br>of Electrical Workers; and International<br>Brotherhood of Boilermakers, Iron Ship<br>Builders, Blacksmiths, Forgers and<br>Helpers, | : | |
| | : | |
| Petitioners | : | |
| | : | |
| v. | : | No. 247 M.D. 2022 |
| | : | |
| Pennsylvania Department of<br>Environmental Protection<br>and Pennsylvania Environmental<br>Quality Board, | : | |
| | : | |
| Respondents | : | |

**O R D E R**

AND NOW, this 1st day of November, 2023, the Application for Summary Relief (ASR) filed by Petitioners in the above-captioned matter is **GRANTED** in part, in accordance with the foregoing Memorandum Opinion. The regulations promulgated by the Pennsylvania Department of Environmental Protection (DEP) and the Pennsylvania Environmental Quality Board (EQB) referred to as the "Trading Program Regulation" (Rulemaking), and found at 25 Pa. Code §§145.301-145.409, are **DECLARED VOID**. DEP and EQB are

**ENJOINED** from enforcing the Rulemaking. All outstanding ASRs and applications filed in this case are **DISMISSED** as moot.

_____
MICHAEL H. WOJCIK, Judge

Bowfin KeyCon Holdings, LLC;   :
Chief Power Finance II, LLC;   :
Chief Power Transfer Parent, LLC;   :
KeyCon Power Holdings, LLC;   :
GenOn Holdings, Inc.; Pennsylvania   :
Coal Alliance; United Mine Workers   :
of America; International   :
Brotherhood of Electrical Workers;   :
and International Brotherhood of   :
Boilermakers, Iron Ship Builders,   :
Blacksmiths, Forgers and Helpers,   :
         Petitioners   :
  :
     v.   :  No. 247 M.D. 2022
  :
Pennsylvania Department of   :
Environmental Protection   :
and Pennsylvania Environmental   :
Quality Board,   :
         Respondents   :  Argued: November 16, 2022

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
            HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE ELLEN CEISLER, Judge
            HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE CEISLER                 FILED: November 1, 2023

      I must respectfully dissent from the majority's conclusion that Petitioners Bowfin KeyCon Holdings, LLC; Chief Power Finance II, LLC; Chief Power Transfer Parent, LLC; KeyCon Power Holdings, LLC; GenOn Holdings, Inc.; Pennsylvania Coal Alliance; United Mine Workers of America; International Brotherhood of Electrical Workers; and International Brotherhood of Boilermakers,

Iron Ship Builders, Blacksmiths, Forgers and Helpers (collectively Petitioners), are entitled to summary relief regarding whether the Regional Greenhouse Gas Initiative (RGGI) administrative rule (Rulemaking) is a tax as opposed to a fee. I do so because there are genuine issues of material fact at this stage regarding whether the Rulemaking establishes a tax or a fee, which deprives all of the parties to this matter of the ability to obtain summary relief on this point.

Section 6.3(a) of the Air Pollution Control Act

> authorizes the establishment of fees sufficient to cover the indirect and direct costs of administering the air pollution control plan approval process, operating permit program required by Title V of the Clean Air Act, [42 U.S.C. Ch. 85, Subch. V,] other requirements of the Clean Air Act[, *id.* §§ 7401-7675,] and the indirect and direct costs of administering the Small Business Stationary Source Technical and Environmental Compliance Assistance Program, Compliance Advisory Committee and Office of Small Business Ombudsman. This section also authorizes the [Environmental Quality Board] by regulation to establish fees to support the air pollution control program authorized by this act and not covered by fees required by [S]ection 502(b) of the Clean Air Act[, *id.* § 7661a(b)].

35 P.S. § 4006.3(a).[1] Respondents Pennsylvania Department of Environmental Protection (DEP) and Pennsylvania Environmental Quality Board (collectively Respondents) argue, in relevant part, that this language authorizes the establishment of the emissions allowance auction process and creates a fee, whereas Petitioners assert that this auction process produces nothing more than a tax in fee's clothing.

> The question of whether an enactment is a tax or regulatory measure is determined by the purposes for which it is enacted and not by its title. *City of Wilkes-Barre v. Ebert*, . . . 349 A.2d 520 ([Pa. Cmwlth.] 1975).

---

[1] Act of January 8, 1960, P.L. (1959) 2119, *as amended*, added by Act of July 9, 1992, P.L. 460.

Taxes have been defined as "burdens or charges imposed by the legislative power upon persons or property to raise money for public purposes, and to defray the necessary expenses of government." *Woodward v. City of Phila*[.], . . . 3 A.2d 167, 170 (1938). This Court has previously noted that:

> The common distinction is that taxes are revenue-producing measures authorized under the taxing power of government; while license fees are regulatory measures intended to cover the cost of administering a regulatory scheme authorized under the police power of government.

[*City of*] *Phila*[.] *v.* [*Se. Pa. Transp. Auth.*], 303 A.2d 247, 251 ([Pa. Cmwlth.] 1973). In *National Biscuit Co. v.* [*City of*] *Philadelphia*, . . . 98 A.2d 182 ([Pa.] 1953), the Supreme Court identified the features of a license fee:

> The distinguishing features of a license fee are (1) that it is applicable only to a type of business or occupation which is subject to supervision and regulation by the licensing authority under its police power; (2) that such supervision and regulation are in fact conducted by the licensing authority; (3) that the payment of the fee is a condition upon which the licensee is permitted to transact his business or pursue his occupation; and (4) that the legislative purpose in exacting the charge is to reimburse the licensing authority for the expense of the supervision and regulation conducted by it.

*Id.* at 615, 98 A.2d at 188.

*White v. Med. Pro. Liab. Catastrophe Loss Fund*, 571 A.2d 9, 11 (Pa. Cmwlth. 1990). "A license fee is a sum assessed for a privilege, and to be valid the fee must be proportionate to the cost of administering the licensing ordinance. If the fee exceeds the reasonable cost of administration, it becomes an illegal tax which the law will not allow." *Martin Media v. Hempfield Twp. Zoning Hearing Bd.*, 651 A.2d 1171, 1173 (Pa. Cmwlth. 1994); *accord Costa v. City of Allentown*, 153 A.3d 1159, 1165 (Pa. Cmwlth. 2017) ("A municipality cannot impose a tax upon a business

under the guise of exercising its police power, and, therefore, a license fee will be struck down if its amount is 'grossly disproportionate to the sum required to pay the cost of the due regulation of the business.' *Flynn v. Horst*, . . . 51 A.2d 54, 60 ([Pa.] 1947).").

This Court, at the preliminary injunction stage, concluded that there is a reasonable likelihood that Rulemaking creates a tax for a number of reasons, including because "the auction proceeds are remitted to the participating states[;]" the proceeds of the Rulemaking will far exceed the cost of administering the $CO_2$ budget trading program; and those proceeds will swell the coffers of DEP's Clean Air Fund to more than twice the General Assembly's total budget appropriations to DEP for the 2021-2022 fiscal year. *See Bowfin KeyCon Holdings, LLC v. Pa. Dep't of Env't. Prot.* (Pa. Cmwlth., No. 247 M.D. 2022, filed July 8, 2022), slip op. at 25-28 (Wojcik, J., single judge op.). Petitioners now echo that reasoning, arguing that the emissions allowance auction creates a tax, rather than a fee, because the proceeds from the auctions will grossly exceed the cost to the DEP of administering the underlying regulatory scheme, may not actually return funds in some instances to the DEP, and does not actually provide licenses to affected emitters. *See* Petitioners' Br. at 21-22.

Even so, there is still a persuasive argument to be made that the emissions allowance auction process does not establish a tax. Respondents assert in their brief that the Rulemaking creates fees, because the auction proceeds will be put towards both administering and supporting DEP's air pollution control programs; the auction process creates emissions allowance credits, the value of which is set by the market, not the government; the allowance credits pertain to a voluntary act (*i.e.*, emission of $CO_2$); and the Rulemaking allows for $CO_2$ emitters to purchase such credits from

other states and apply them to emissions made in this Commonwealth. *See* Respondents' Br. at 13-21.

Based upon the record before us, it does not seem that the emissions allowance auction process would impose what could be deemed fees in the traditional sense, but, by the same token, it is not entirely clear that the proceeds raised thereby would constitute a tax. Given this, there is a genuine issue of material fact regarding the question of whether the Rulemaking establishes a tax or a fee. Accordingly, I would deny summary relief regarding this issue to both Petitioners and Respondents, and dissent from the majority's decision to the contrary.

_____
ELLEN CEISLER, Judge